**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**WILLIAM M. HENSLEY,**

      **Plaintiff,**

**v.**                           **Case No.: 5:13-cv-27810**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 14 & 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

1

request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.     <u>Procedural History</u>

On October 12, 2010, Plaintiff William M. Hensley ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of July 1, 2006, (Tr. at 158, 181, 188), due to "chronic back pain, right foot surgery with plates and pins in it-causes pain, left knee pain, left shoulder and arm pain, chronic headaches, hip pain, foot surgery with plates and pins." (Tr. at 212). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 81, 86). Claimant then filed a request for an administrative hearing, (Tr. at 110), which was held on July 18, 2012, before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 30-50). By written decision dated July 26, 2012, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 15-25). The ALJ's decision became the final decision of the Commissioner on September 18, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an answer and a transcript of the administrative proceedings. (ECF Nos. 12 & 13). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 14), and the Commissioner responded with a Brief in Support of Defendant's Decision. (ECF No. 15). Claimant subsequently filed a reply memorandum. (ECF No. 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 49 years old at the time he filed the instant applications for benefits, and 51 years old on the date of the ALJ's decision. (Tr. at 158, 181, 188). He has an eleventh grade education and has obtained a GED. Claimant communicates in English. (Tr. at 24, 34, 37). He previously worked as a general laborer in the field of construction and as a roofer. (Tr. at 24, 43, 213).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in

Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2008. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 1, 2006, the

4

alleged disability onset date. (Tr. at 17, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "status-post calcaneus fracture and degenerative joint disease." (Tr. at 17-20, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of left shoulder, back, hip, and left knee pain; "vision problems"; a contusion of the ribs; depression; and headaches. (Tr. at 18-20). However, the ALJ found these alleged impairments to either be non-severe or not medically determinable. (Tr. at 18-20).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except this individual could stand and/or walk for two hours out of an eight hour workday. He could sit for six hours out of an eight-hour workday. In addition, he could occasionally climb ramps, stairs, ladders, ropes, and scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to extreme cold, extreme heat, and vibrations. He must avoid even moderate exposure to hazards such as moving machinery and unprotected heights.

(Tr. at 20-24, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work. (Tr. at 24, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 24, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1960, and was defined as a younger individual age 18-49 on the alleged disability onset date; however, Claimant subsequently changed age categories to closely approaching advanced age; (2) he had at least a high school

education and could communicate in English; and (3) transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that the Claimant was "not disabled," whether or not the Claimant had transferable job skills. (Tr. at 24-25, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 24-25, Finding No. 10), including work in light, unskilled occupations, such as battery tester, light assembly worker, and garment bagger. (Tr. at 25). Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV.   <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant raises a single challenge to the Commissioner's decision. (ECF No. 14 at 2). Specifically, Claimant insists that the ALJ's finding at step five of the sequential process is not supported by substantial evidence. (*Id.* at 8-11). The crux of Claimant's argument is that the ALJ's RFC determination actually supports a finding that Claimant is *only* able to engage in sedentary work, *not* light work as the ALJ found. (*Id.* at 9-10). In support of his position, Claimant points out that the ALJ found Claimant's ability to walk or stand was limited to two hours out of an eight-hour workday, which Claimant believes contradicts the ALJ's determination that he is able to perform light work. (*Id.*) Furthermore, Claimant asserts that the ALJ failed to follow Section DI 25015.030 of the SSA's Program Operations Manual System ("POMS") when he relied on vocational expert testimony that purportedly conflicted with the definition of light work contained in the SSA's rulings and the Dictionary of

Occupational Titles (4th ed. 1991) ("DOT").[1] (ECF No. 14 at 8-10). In other words, Claimant contends that the ALJ erred in crediting the vocational expert's conclusion that the light work positions suitable for Claimant could "primarily [be] done from a seated position," because the vocational expert's testimony was inconsistent with the very definition of light work, which involves "'a good deal of walking or standing.'" (ECF No. 14 at 10) (quoting SSR 83-10, 1983 WL 31251, at *5). Claimant asserts that the distinction between sedentary and light exertional levels in this case is "particularly important" because a determination that he is only able to participate in sedentary level work would require a finding of disability under Title XVI as of his protective filing date.[2] (ECF No. 14 at 10).

---

[1] Language identical to that contained in Section DI 25015.030 of the POMS was published as SSR 00-4p, 2000 WL 1898704. Claimant cites the following language from SSR 00-4p in support of his position:

> SSA adjudicators may not rely on evidence provided by a VE, VS, or other reliable source of occupational information if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions. For example:
>
> Exertional Level
>
> We classify jobs as sedentary, light, medium, heavy and very heavy (20 CFR 404.1567 and 416.967). These terms have the same meaning as they have in the exertional classifications noted in the DOT.
>
> Although there may be a reason for classifying the exertional demands of an occupation (as generally performed) differently than the DOT (e.g., based on other reliable occupational information), the regulatory definitions of exertional levels are controlling. For example, if all available evidence (including VE testimony) establishes that the exertional demands of an occupation meet the regulatory definition of "medium" work (20 CFR 404.1567 and 416.967), the adjudicator may not rely on VE testimony that the occupation is "light" work.

2000 WL 1898704, at *3; (ECF No. 14 at 8-9).

[2] Grid Rule 201.14 directs a finding of "disabled" for individuals limited to sedentary work who are (1) closely approaching advanced age, (2) have a high school education or more, which does not provide for direct entry into skilled work, and (3) have previous work experience which is skilled or semiskilled, where the skills are not transferable. 20 C.F.R. Pt. 404, Subpart P, Appendix 2 § 201.14. In contrast, Grid Rule 202.14 directs a finding of "not disabled" for individuals who possess identical age, education, and prior work experience, but are capable of performing light work. *Id.* § 202.14.

In response, the Commissioner contends that the ALJ appropriately determined that Claimant possessed the ability to perform reduced light work, as opposed to the full range of light work. (ECF No. 15 at 9). The Commissioner asserts that once the ALJ found that Claimant's RFC fell between the sedentary and light exertional levels, the ALJ correctly obtained testimony from a vocational expert to determine what, if any, occupations were suitable given Claimant's specific limitations. (*Id.* at 11). The Commissioner insists that the ALJ acted in accordance with the regulations in doing so, and cites several federal court of appeals and district court decisions affirming the Commissioner's decision in cases where a claimant could perform the lifting requirements of light work but required a sit/stand option. (*Id.*)

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence of record, including documentation of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### A. Treatment Records

On September 4, 2005, Claimant reported to Raleigh General Hospital's emergency room after being hit by a car while riding a lawn mower. (Tr. at 269). He complained of injuries or pain in his neck, left arm, left elbow, and left wrist. (*Id.*) A diagnostic imaging report from that date authored by Alan M. Lintala, M.D., concluded that there were no fractures or subluxations of the cervical spine, and x-rays of Claimant's left shoulder evidenced an old healed facture deformity of the mid shaft left clavicle and later aspects of the left third and fourth ribs, but there was no evidence of acute fractures or dislocations of the left shoulder. (Tr. at 371). Dr. Lintala

also observed that there were no fractures or dislocations of the left elbow, and there was a minimally displaced comminuted fracture of the distal shaft left ulna. (Tr. at 371-72).

On November 22, 2005, Claimant followed up at Raleigh General Hospital. (Tr. at 366). His chief complaint was left wrist, left elbow, and left shoulder pain. (*Id.*) Claimant reported that he occasionally wore a splint and had not taken any anti-inflammatories. (*Id.*) Upon examination, Claimant did not appear to be in acute distress. (*Id.*) The treating physician's impression was a healing left ulnar fracture. (Tr. at 367). The physician recommended that Claimant wear a splint as necessary and not perform any heavy lifting with his left arm. (*Id.*) Claimant was also prescribed Naprosyn and instructed to follow up in four weeks. (*Id.*)

On January 3, 2006, Claimant returned to Raleigh General Hospital for a re-evaluation of his left ulnar fracture. (Tr. at 365). Claimant reported no problems with his wrist, but did report problems with his left shoulder and elbow. (*Id.*) The treating physician noted increased healing of the left distal ulnar fracture. (*Id.*) The physician recommended physical therapy to treat a contusion to Claimant's rotator cuff and probable medial epicondylitis of Claimant's left elbow. (*Id.*)

On January 19, 2006, Claimant treated with Jukey Dotson, M.S., P.T., at Athletic and Physical Therapy Services, Inc. (Tr. at 364). Claimant reported deep, aching pain in his left shoulder, left elbow, and left wrist. (*Id.*) Claimant stated that he was not taking any medication at that time. (*Id.*) Mr. Dotson assessed Claimant with left shoulder tendinitis. (*Id.*) He further noted that Claimant's strength was normal and there was no tenderness on palpitation of the left shoulder. (*Id.*) Mr. Dotson indicated that Claimant's rehabilitation potential was good with therapy. (*Id.*) Mr.

Dotson recommended that Claimant be seen two to three times per week for four to six weeks for modalities to decrease pain, therapeutic exercises, and education regarding home exercise. (*Id.*)

From January 24, 2006 through February 14, 2006, Claimant continued to undergo physical therapy for his left shoulder and left wrist at Athletic and Physical Therapy Services, Inc. (Tr. at 361-63). Claimant initially complained of soreness, but by his February 2 and 10, 2006, appointments, he felt "pretty good" and reported that his shoulder was not giving him any problems. (Tr. at 362). On February 14, 2006, Claimant reported that he felt sore from shoveling snow, but he tolerated treatment well. (Tr. at 361).

On November 10, 2007, an x-ray was performed on Claimant's lumbar spine after he reported pain in that area. (Tr. at 392). A diagnostic imaging report completed by William Sheils, M.D., found that Claimant had minimal degenerative change at L4. (*Id.*) Otherwise, the exam was unremarkable. (*Id.*)

On February 28, 2009, an MRI was performed on Claimant's lumbar spine at Charleston Area Medical Center after he complained of low back pain with radiculopathy into both legs. (Tr. at 391). Christopher A. Schlarb, M.D., observed that there was a central and right-sided protrusion of the disc at L1-L2. (*Id.*) He also found bulging of the annulus fibrosis at several levels with degenerative disease and mild central acquired spinal stenosis at L4-L5. (*Id.*)

On March 18, 2010, Claimant presented to the Emergency Department of Appalachian Regional Healthcare for treatment of a foot and ankle injury. (Tr. at 286, 304-307). According to Claimant, he had fallen off of a roof causing an injury to his right leg and foot. (Tr. at 305). Claimant relayed to Nathan Doctry, M.D., that he was

10

experiencing right foot pain; however, he denied any other complaints including numbness or back pain. (Tr. at 286). The record reflects that Claimant was admitted for pain control and offered pain medication which he initially refused, but he subsequently agreed to receive morphine sulfate. (*Id.*) Upon orthopedic examination by Dr. Doctry, Claimant had full range of motion in the upper extremities and neck, with no pain on deep percussion of the entire spine. (Tr. at 286). In addition, there was full range of motion in both knees. (*Id.*) As to the right foot, Dr. Doctry's examination revealed marked swelling and ecchymosis, although the dorsalis pedis pulses were brisk with good sensation intact. (*Id.*) The remainder of the examination was unremarkable. (*Id.*) Claimant was diagnosed with a comminuted intraarticular fracture of the right calcaneus. (*Id.*)

During that visit, Dr. Doctry ordered a medical consultation, which was performed by Mebrahtom Tesfai, M.D. (Tr. at 289-291). Dr. Tesfai noted that Claimant had no significant past medical history other than chronic smoking and alcohol consumption. (Tr. at 290). Claimant denied any prior medical problems including a denial of hypertension or diabetes mellitus. Claimant further denied any history of drug abuse and reported he did not take medication for any reason. (*Id.*) A ten point review of systems was deemed non-contributory without any complaint. (*Id.*) The physical examination was unremarkable with the exception of swelling of the right ankle joint area, including his foot. (Tr. at 291). Dr. Tesfai assessed Claimant with a right calcaneus bone fracture without dislocation, secondary to trauma. (*Id.*) Claimant was advised that he would be followed as an outpatient the next few days. (*Id.*)

Dr. Doctry also ordered a series of radiology examinations beginning with an

x-ray of the right ankle on March 18, 2010. (Tr. at 295). The x-ray revealed an acute intraarticular comminuted fracture through the calcaneus without dislocation. (*Id.*) No acute fracture or dislocation of the ankle joint was identified; however, there was soft tissue swelling about the ankle. (*Id.*) An x-ray of the pelvis and right femur were both normal. (Tr. at 296). X-ray examination of the right tibia and fibula showed soft tissue swelling of the ankle and the distal lower extremity with no acute fracture or dislocation of the tibia or fibula. (Tr. at 297). An x-ray of the right foot confirmed an acute comminuted intraarticular fracture of the calcaneus without dislocation and soft tissue swelling about the ankle. (*Id.*) Finally, a chest x-ray showed there was no pneumothorax or lung contusion. (Tr. at 298). The films did reveal old left rib fractures and a healing right lower rib fracture. (*Id.*) There was no active chest disease. (*Id.*)

A CT scan of the right ankle without contrast was performed that same day. (Tr. at 299-300). The study showed a comminuted fracture of the calcaneum; however, no dislocation was observed. (*Id.*) There was no evidence of fracture of the talus or navicular bone, but there was soft tissue swelling. Once again, the test confirmed a diagnosis of a comminuted fracture of calcaneum with no dislocation and soft tissue swelling. (*Id.*)

Claimant also received an inpatient physical therapy evaluation during his visit, which was ordered by Dr. Doctry. (Tr. at 302-303). Claimant reported increased pain in his foot and pain in his ankle. (Tr. at 302). As to his functional assessment, Claimant remained independent in his ability to roll or turn over; supine to sit; sit to supine; move from the bed to the chair and back; sit to stand; and activities of daily living. (*Id.*) Claimant could ambulate a distance of ten feet with no weight bearing on

the right leg. (Tr. at 303). His gait and posture analysis revealed his head was in midline with his shoulders and pelvis leveled. (Tr. at 303). The neurological assessment was normal, including tone and coordination. (*Id.*) There were no vision or hearing issues noted. (*Id.*) Treatment received at this evaluation included crutch fitting and gait training. (*Id.*) Claimant was able to properly ambulate with crutches. (*Id.*) The physical therapist opined that Claimant had good rehabilitation potential with no learning barriers. (*Id.*) Claimant's problem list included decreased ambulation and pain. (*Id.*) Claimant was discharged from this evaluation with a recommendation to participate in outpatient rehabilitation. (*Id.*) Upon discharge, Claimant was provided crutches with instructions to avoid any weight bearing to the right leg and foot. (Tr. at 285). Dr. Doctry advised Claimant that he would schedule Claimant for surgery on an outpatient basis. (*Id.*)

On March 30, 2010, Claimant was examined by Dr. Doctry in preparation for surgery to repair the comminuted intraarticular fracture to the right calcaneus. (Tr. at 328). The examination revealed less swelling over the right foot, allowing the skin to be tented, which confirmed that Claimant could undergo surgery. (*Id.*) Based on the radiological examinations, in particular the CT scan results, Dr. Doctry determined that an open reduction and internal fixation and reconstruction of the injured area was required. (*Id.*)

Claimant underwent examination by Dr. Doctry once again on April 5, 2010, in preparation for surgery to the right calcaneus. (Tr. at 271). The examination revealed all systems were normal with the exception of skin tenting over the right ankle. (*Id.*) Dr. Doctry noted Claimant was not taking any medication and cleared Claimant for surgery, which was performed the same day. (Tr. at 271, 274). An open reduction and

internal fixation using the Stryker Vari-Ax locking plate was performed. (Tr. at 274). Claimant's postoperative diagnosis was a comminuted intraarticular fracture of the right calcaneus. (*Id.*)

After the surgery, Claimant was again evaluated by the physical therapy department at Appalachian Regional Healthcare as referred by Dr. Doctry. (Tr. at 282). Claimant indicated he continued to experience increased pain in his ankle with movement, which he described as "8 out of 10" on the pain intensity scale. (*Id.*) Claimant remained independent in all measured categories of functional assessment. (*Id.*) He could ambulate a distance of twenty-five feet on level surfaces with no weight bearing on the right leg and foot. (Tr. at 283). Claimant was observed to have a three-point gait pattern with none on the right. (*Id.*) A neurological assessment revealed normal static sitting and standing balance as well as normal dynamic sitting balance and good dynamic standing balance. (*Id.*) Claimant's sensations were all intact with normal tone and coordination. (*Id.*) He had intact reflexes with no deficits in regard to vision or hearing. (*Id.*) Claimant was fitted for a boot and given gait training. (*Id.*) He tolerated the session well and was discharged. (*Id.*)

Claimant next visited Dr. Doctry on April 13, 2010. (Tr. at 327). Claimant's surgical incision appeared to be healing well, including the wound edges, with no sign of infection. (*Id.*) Dr. Doctry indicated that Claimant was recovering well from the surgery and advised him to return in one week for a wound check. (*Id.*)

On April 27, 2010, Claimant followed up with Dr. Doctry. (Tr. at 326). Dr. Doctry again found that the surgical wound was healing well. (*Id.*) Claimant advised Dr. Doctry that he had done some weight bearing on the right leg and foot while at home. (*Id.*) Dr. Doctry advised Claimant he was not to walk on the right leg at this

time. (*Id.*) Claimant was advised to return in three to four weeks for x-rays. (*Id.*)

Claimant next visited Dr. Doctry on May 26, 2010, at seven weeks status post calcaneus fracture. (Tr. at 325). The wound appeared to be healing well, although one small area of the wound site appeared to have an opening. (*Id.*) Claimant was advised to keep his foot dry and to return in four weeks for x-rays. (*Id.*) Dr. Doctry believed by that time, Claimant would be ready to begin full weight bearing on the right leg and foot. (*Id.*)

On June 23, 2010, when Claimant next saw Dr. Doctry, he was approximately eleven weeks into his recovery of the calcaneus fracture. (Tr. at 324). Dr. Doctry advised Claimant he could begin weight bearing on the right leg and foot. (*Id.*) Claimant attempted weight bearing at the examination and reported to Dr. Doctry that "it [did] not hurt too bad." (*Id.*) Dr. Doctry recorded that Claimant complained of pain in his left shoulder as a result of an old injury and that "he just has multiple complaints." (*Id.*) That same day, Claimant underwent x-rays of his left shoulder and right calcaneum as ordered by Dr. Doctry. (Tr. at 331). As to the left shoulder, although there was evidence of old fractures to the left clavicle and left upper ribs, no acute fracture or dislocation was seen. (*Id.*) An x-ray of the right calcaneum revealed an old fracture deformity with metallic plate and screw in place. (*Id.*) There were also osteoporotic changes, but no acute fracture. (*Id.*)

Dr. Doctry next saw Claimant on July 21, 2010, and he indicated that Claimant had excellent motion at the ankle joint although he continued to have some swelling. (Tr. at 323). Claimant was continuing to walk with the equalizer boot; however, Dr. Doctry advised him to discontinue wearing the boot and replace it with a sneaker. (*Id.*) Dr. Doctry noticed that Claimant still had some swelling in the area. (*Id.*) Dr.

Doctry ordered additional x-rays of the right ankle. (*Id.*)

On August 20, 2010, Dr. Doctry noted that x-rays taken that day revealed the calcaneal fracture was healing, but he further observed that there may be the beginnings of some degenerative changes of the subtalar joint. (Tr. at 322). The x-ray report itself revealed an old fracture of calcaneum with a metallic plate and screw in place as well as an indication of osteopenia. (Tr. at 330). Claimant continued to walk with a limp and reported continued pain in his ankle at the end of each day. (Tr. at 322). Examination of the right ankle by Dr. Doctry revealed approximately 20 degrees of dorsiflexion and 35 degrees of plantar flexion with good ankle motion. (*Id.*) Dr. Doctry indicated that Claimant also complained of pain over his left shoulder; however, he had full range of motion in the shoulder upon examination. (*Id.*) Based on Claimant's condition, Dr. Doctry considered Claimant as a candidate for subtalar joint fusion, which would include the removal of the "hardware" in his ankle. (*Id.*) Dr. Doctry suggested physical therapy for Claimant's ankle and prescribed pain medication. (*Id.*)

Claimant was next examined by Dr. Doctry on October 28, 2010. (Tr. at 320-321). At that time, Claimant continued to complain of pain in his right ankle with a small amount of tenderness over the medial plantar nerve coming from the posterior tibial nerve. (Tr. at 320). It did not appear to Dr. Doctry that Claimant had adequate arch support over his leg. (*Id.*) Claimant had difficulty standing on his right leg, and he reported a throbbing sensation in his leg after standing on it as well as swelling in his right foot. (*Id.*) Dr. Doctry opined that Claimant was not able to stand for prolonged periods or walk long distances. (*Id.*) In terms of disability, he believed Claimant had some permanency related to his subtalar joint in the right ankle. (*Id.*)

16

In relation to Claimant's pain, he reported to Dr. Doctry that since pain medication was no longer being prescribed, he had compensated by drinking more. (*Id.*) Dr. Doctry noted that he would attempt to manage Claimant's pain medication, including inquiring of Dr. Mehta at the New River Family Health Clinic about maintaining Claimant on some type of pain medication while deciding on the best course of additional treatment for the right ankle. (*Id.*)

On December 9, 2010, Claimant reported to Dr. Doctry that he was experiencing severe pain in the right ankle and foot on waking; however, once Claimant started walking, the pain would ease. (Tr. at 319). Dr. Doctry's examination of the right foot revealed better range of motion, flexion, and extension with less swelling. (*Id.*) Dr. Doctry noted Claimant continued to walk without arch supports for his feet. (*Id.*) Claimant was prescribed medication to take at night, and instructed to return in three months, at which point Dr. Doctry would decide the need for x-rays of the foot and ankle. (*Id.*)

As of his March 21, 2011 visit with Dr. Doctry, Claimant continued to have some difficulty in walking for long periods of time. (Tr. at 382). Dr. Doctry observed that Claimant had a gait, but he did not have a severe limp. (*Id.*) An examination of the right foot and ankle elicited pain on palpation of the subtalar joint with Claimant describing this pain as "10 out of 10." (*Id.*) Dr. Doctry believed that the nature of the injury sustained by Claimant would cause him to be more susceptible to developing arthritis of the subtalar joint. (*Id.*) The treatment plan at this visit included x-rays and referral to the pain clinic to assist in chronic pain management. (*Id.*) Dr. Doctry's overall impression at this examination was status post calcaneal fracture with bone graft with early subtalar joint arthritis of the right foot. (*Id.*)

Claimant next visited Dr. Doctry on May 13, 2011. (Tr. at 380-81). Dr. Doctry noted Claimant was using the right leg, and his walk had improved. (Tr. at 380). Dr. Doctry further indicated that Claimant was ambulating "fairly well." (*Id.*) A review of radiological films of the right ankle revealed good healing of the calcaneal fracture, although the subtalar joint, posterior facet of the calcaneus, and talus appeared somewhat arthritic. (*Id.*) The radiology report itself indicated there was no recurrent fracture or dislocation of the heel. (Tr. at 389). The report also stated that there appeared to be a minor plantar spur as well as degenerative arthritis of the subtalar joint. (*Id.*) Claimant reported to Dr. Doctry that during the course of a day, he experienced a little pain when he woke up, but once he has stood up and walked for a short time, the pain eased and ultimately did not bother him. (Tr. at 380). Dr. Doctry opined that a joint fusion procedure was not indicated as Claimant was doing so well. (*Id.*) Claimant further complained to Dr. Doctry of right shoulder pain. (*Id.*) On examination, he had full range of motion with some pain on just external rotation and abduction, and a minor amount of tenderness over the biceps. (*Id.*) Plain x-rays of the shoulders were ordered. (*Id.*) Claimant advised Dr. Doctry that he had missed a pain management appointment, and Dr. Doctry informed Claimant that he would ask the pain management clinic if they could see him "sooner." (*Id.*)

Claimant next treated with Dr. Doctry on June 27, 2011, primarily for pain in his heel that he rated as "6 out of 10." (Tr. at 379). Claimant also mentioned he was experiencing pain in his shoulder at an "8 out of 10" level. (*Id.*) Dr. Doctry noted that Claimant was able to ambulate without much of a limp, although the limp became more pronounced as the activity level increased. (*Id.*) Claimant reported that his right heel continued to bother him, but it did not totally prevent him from doing things.

(*Id.*) Dr. Doctry's examination of the ankle revealed good range of motion, and Claimant was advised that the cold winters could exacerbate the problem. (*Id.*) Dr. Doctry recorded that prior x-rays revealed good joint space in the anterior and middle facet of the calcaneus with a minor, although not significant, narrowing in the posterior facet. (*Id.*) Due to the radiology results, in combination with the examination of Claimant, Dr. Doctry felt continued observation was the appropriate course of treatment. (*Id.*) As to Claimant's complaint of shoulder pain, Dr. Doctry's examination of both shoulders revealed good range of motion. (*Id.*) X-rays of his shoulders taken that same day revealed mild degenerative arthritis of the AC joints with "normal subacromial space and the glenohumeral joint." (Tr. at 388). Based on the examination and radiology films, Dr. Doctry opined that there was some AC joint arthritis in both of Claimant's shoulders; however, Dr. Doctry did not believe that this warranted any treatment or therapy at that time. (Tr. at 379).

Claimant followed up with Dr. Doctry on August 16, 2011. (Tr. at 378). He reported that he had recently fallen and was experiencing tenderness about the ribs with right flank pain. (*Id.*) Additionally, he continued to experience intermittent right ankle pain. (*Id.*) As with prior evaluations, Claimant relayed that the right ankle was stiff when he woke up, but "ease[d] up" after he had walked for a period of time. (*Id.*) Claimant added that he was still able to "get around." (*Id.*) Dr. Doctry diagnosed Claimant with status post calcaneal fracture of the right foot and rib contusions. (*Id.*) Claimant denied wanting any pain medication. (*Id.*)

On March 30, 2012, Claimant returned to Dr. Doctry complaining of pain in the right heel, which he described as "5 out of 10." (Tr. at 377). Claimant reported left shoulder pain as well. (*Id.*) An examination revealed Claimant could walk without

much discomfort. (*Id.*) Dr. Doctry ordered an x-ray of the right heel to determine whether Claimant had any severe degenerative changes in that area. (*Id.*) As for the left shoulder complaint, Dr. Doctry recorded that Claimant had full range of motion. (*Id.*) Claimant reported he continued to drink and requested pain medication because people broke into his house and took his medication. (*Id.*) Dr. Doctry refused Claimant's request. (*Id.*)

Claimant next visited Dr. Doctry on April 13, 2012. (Tr. at 376). Claimant continued to report pain in his feet to Dr. Doctry, which Claimant rated as "3 out of 10." (*Id.*) Examination revealed tenderness and some swelling over the right foot. (*Id.*) X-rays taken of Claimant's right foot that day revealed an old fracture deformity of calcaneum with metallic plate and screw in place with no acute fracture or dislocation seen. (Tr. at 387). An x-ray of Claimant's left foot was normal. (Tr. at 386). Claimant again complained of left shoulder pain as well. (Tr. at 376). He informed Dr. Doctry that he was in a motor vehicle accident four years prior and that the accident injured his left shoulder. (*Id.*) Dr. Doctry observed that on rotation, Claimant's shoulder had some clicking and swelling when compared to his right shoulder. (*Id.*)

On April 26, 2012, Claimant again treated with Dr. Doctry. (Tr. at 375). He complained of left shoulder pain and again relayed that he believed the cause of the pain was a motor vehicle accident four years prior. (*Id.*) Dr. Doctry noted that he had some mild clicking in the left shoulder, but good strength. (*Id.*) Dr. Doctry further indicated that x-rays of the shoulder were negative. (Tr. at 375, 385). X-rays of Claimant's left scapula were also taken that day. (Tr. at 384). Bharat Patel, M.D., reported that the x-rays showed no fracture or dislocation of the scapula. (*Id.*) Dr.

Patel did observe an old fracture deformity of multiple left ribs and the left clavicle. (*Id.*) Finally, Dr. Patel found that there was no abnormality of the glenohumeral joint. (*Id.*)

On June 20, 2012, Claimant treated with Mountaineer Family Medicine for back pain. (Tr. at 394). At that appointment, he was given refills of some type of medication, but the medical record is illegible as to what. (*Id.*) He returned to Mountaineer Family Medicine on July 20, 2012, again describing back pain. (Tr. at 393). Again, the medical record is illegible as to what, if any, treatment Claimant received. (*Id.*)

### B. Evaluations and Opinions

On June 22, 2011, Surayia T. Hasan, M.D., performed a Disability Determination Examination on behalf of the SSA. (Tr. at 336-339). Claimant reported he had fallen off of a roof one year prior and sustained a fracture to his ankle, which required surgery.[3] (Tr. at 336). Claimant complained of persistent pain in the right ankle and reported that his treating physician had recommended further surgery; however, Claimant had refused to undergo another surgery at that time. (*Id.*) In addition, Claimant complained of pain in the right shoulder, elbow, and hand, as well as numbness in his right arm that lasted up to thirty minutes at a time. (*Id.*) Dr. Hasan's review of Claimant's musculoskeletal system included pain in Claimant's shoulder, elbow, hand, and right ankle with difficulty in mobilization. (Tr. at 337). Dr. Hasan's examination of Claimant's central nervous system revealed that the cranial nerves were intact, and Claimant could move both arms and legs. (Tr. at 338). There

---

[3] Although the "History of Present Illness" portion of the medical record for the examination states that Claimant reported fracturing his left ankle, that appears to be a mistake. (Tr. at 336). All of the record medical evidence demonstrates that Claimant's right ankle was fractured after falling from a roof, and there is no evidence of a left ankle fracture in the record.

appeared to be normal muscle power in all limbs, although sensations were diminished in the right leg up to the groin. (*Id.*) Physical examination of Claimant's musculoskeletal system revealed that Claimant walked with a limp on his right side and could not walk on his toes and heels. (*Id.*) Dr. Hasan recorded that Claimant's straight leg raising sign was 80 degrees bilaterally with complaints of pain in the back of the legs. (*Id.*) Claimant's right ankle extension was limited to ten degrees accompanied by slight pain on movement. (*Id.*) Dr. Hasan observed that there was no swelling of the ankle and none of the ankle joints appeared to be acutely inflamed. (*Id.*) She noticed there appeared to be a slightly limited dorsiflexion of the right ankle. (*Id.*) Dr. Hasan also remarked that all movements of the spine were painless with anterior flexion of 90 degrees and sideward flexion of 25 degrees. (*Id.*) Additionally, Claimant had full range of movement of the shoulders, and his neck appeared normal. (*Id.*) Claimant had reduced sensation of the right leg, but there were no issues with his lumbosacral spine. (*Id.*) Dr. Hasan could not clinically explain Claimant's loss of right leg sensation. (*Id.*) The remainder of the examination was unremarkable with the exception of vision. Dr. Hasan found Claimant had visual acuity in the right eye of 20/200 with no vision in the left eye. (Tr. at 337). Dr. Hasan indicated that Claimant's bilateral vision was 20/30 (*Id.*)

On June 27, 2011, Dr. Hasan issued an addendum to the Disability Determination Examination. (Tr. at 340). Claimant was asked to return for the purpose of a repeat visual evaluation. (*Id.*) Upon examination, Dr. Hasan observed that Claimant's visual acuity of the right eye remained at 20/200 while visual acuity of the left eye tested at 20/40 resulting in bilateral vision of 20/40. (*Id.*) Claimant

reported to Dr. Hasan that he had amblyopia since birth and was blind in his right eye since childhood. (*Id.*)

On July 23, 2011, Uma Reddy, M.D., completed a Physical RFC Assessment regarding Claimant's functional limitations.[4] (Tr. at 344-351). Dr. Reddy recorded that Claimant's primary diagnoses were arthralgias and headaches. (Tr. at 344). Dr. Reddy also noted that Claimant alleged chronic back pain, right foot pain, left knee pain, left shoulder pain, chronic headaches, hip pain, and foot surgery. (Tr. at 351). She found that there was no additional information in the file prior to December 31, 2008, which was the date Claimant was last insured. (*Id.*) Therefore, Dr. Reddy concluded that there was insufficient evidence to evaluate Claimant's impairments prior to his date last insured. (*Id.*)

That same day, Dr. Reddy also completed a Physical RFC Assessment representing a current evaluation. (Tr. at 352-359). Dr. Reddy listed Claimant's primary diagnosis as a right ankle fracture and his secondary diagnoses as arthralgias and headaches. (Tr. at 352). Dr. Reddy found that Claimant could occasionally lift fifty pounds, frequently lift 25 pounds, stand and/or walk for a total of about six hours in an eight-hour work day, and sit for about six hours in an eight-hour work day. (Tr. at 353). Dr. Reddy also concluded that Claimant had unlimited ability to push and pull. (*Id.*) As for postural limitations, Claimant could frequently climb ramps and stairs, balance, stoop, kneel, and crawl. (Tr. at 354). However, Claimant

---

[4] On March 24, 2011, David Milam, a Single Decisionmaker, completed two Physical RFC Assessments. (Tr. at 61-76). In the first Physical RFC Assessment, Mr. Milam concluded that there was insufficient evidence to evaluate Claimant's impairments prior to his date last insured, December 31, 2008. (Tr. at 68). In the second Physical RFC Assessment, Mr. Milam recorded that Claimant's "current status" was unavailable because he did not attend his consultative examination with Dr. Hasan, which was originally scheduled for March 22, 2011. (Tr. at 74, 76). Therefore, Mr. Milam concluded that there was insufficient evidence to evaluate Claimant's impairments. (Tr. at 76).

could only occasionally crouch and climb ladders, rope, or scaffolds. (*Id.*) As for manipulative, visual, and communicative limitations, Dr. Reddy found none were established. (Tr. at 355-56). With regard to environment limitations, Claimant was found to have no limitations with exposure to wetness, humidity, noise or fumes, odors, dusts, gases, or poor ventilation. (Tr. at 356). However, Dr. Reddy determined that Claimant should avoid concentrated exposure to extreme cold and heat as well as vibration. (*Id.*) Finally, Dr. Reddy concluded that Claimant should avoid even moderate exposure to hazards such as machinery or heights. (*Id.*)

In relation to Claimant's symptoms, Dr. Reddy noted that Claimant had a history of a right ankle fracture as a result of a fall in 2010, which required surgical repair. (Tr. at 357). She indicated that the injury had since healed, and although Claimant did not require an assistive device when walking, he did walk with some limp during his recent disability examination. (*Id.*) Dr. Reddy further noted that Claimant had no neurological deficit. (*Id.*) She opined that his claim of headaches was not well established. (*Id.*) In addition to headaches, Claimant reported joint aches and pains, especially in his shoulder and hips, which Dr. Reddy felt might indicate some arthralgias. (*Id.*) Dr. Reddy ultimately found Claimant to be only partially credible. (*Id.*) In forming this opinion, Dr. Reddy observed that Claimant's activities of daily living indicated that he lived alone and could take care of his personal needs with certain limitations. (*Id.*) Dr. Reddy noted that the activities of daily living and limitations were reported in 2010 and that Claimant's ankle had improved since that time. (*Id.*) Relying on Dr. Hasan's examination and her own conclusions as to Claimant's Physical RFC, Dr. Reddy opined that Claimant's impairments did not meet any of the impairments in the Listing. (*Id.*)

24

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

### The ALJ's Finding at Step Five of the Sequential Process

Claimant contends that the ALJ's finding at step five of the sequential process was not supported by substantial evidence because the two-hour stand/walk limitation included in Claimant's RFC qualifies him to perform only sedentary work— not light work as the ALJ concluded. (ECF No. 14 at 9-10). Thus, Claimant does not

25

challenge the two-hour stand/walk limitation, itself. To the contrary, he apparently agrees with that limitation. Rather, Claimant disputes the premise that an individual who is limited to two hours of standing and walking in an eight–hour workday can ever be capable of performing light exertional work, as that phrase is defined in SSA policies and regulations. (*Id.*)

In support of his position, Claimant cites various SSRs defining light work, as well as the DOT's definition of light work set forth in the specific occupations identified by the vocational expert as jobs that Claimant could perform. (*Id.* at 10). Claimant insists that the vocational expert provided an incorrect opinion when he stated that the light exertional level occupations suitable for Claimant could primarily be performed from a seated position. According to Claimant, occupations performed primarily from a seated position do not fall within the regulatory definition of light work. (ECF No. 14 at 10). Therefore, Claimant maintains that the ALJ violated SSR 00-4p (also POMS § DI 25015.030) by relying on the vocational expert's testimony at step five. (ECF No. 14 at 10). Claimant argues that this error is prejudicial given that Claimant should have been restricted to sedentary level work by virtue of the two-hour stand/walk limitation, and a restriction to sedentary work would have led to a finding of disability under the Medical-Vocational Guidelines listed in Appendix 2 of Subpart P of Part 404 ( the "Grids").

At step five of the sequential process, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain*, 715 F.2d at 868-69. The Commissioner must establish two things: (1) that the claimant,

considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore*, 538 F.2d. at 574. In order to carry this burden, the Commissioner may rely upon the Grids, "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); *see also* 20 C.F.R. §§ 404.1569, 416.969.

The Grids categorize jobs by their physical-exertion requirements; accordingly, "[a]t step 5 of the sequential evaluation process, RFC **must** be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do." SSR 96-8p, 1996 WL 374184, at *3 (emphasis added). However, the Grids consider only the exertional component of a claimant's disability, and even then, they do not contemplate all possible variations of exertional levels. 20 C.F.R. §§ 404.1569, 416.969. For that reason, when a claimant has significant nonexertional impairments, has a combination of exertional and nonexertional impairments, or has an RFC that falls between exertional levels, the Grids merely provide a framework to the ALJ, who must give full individualized consideration to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* §§ 404.1569, 416.969; 20 C.F.R. Pt. 404, Subpart P, App'x 2 § 200.00(d); *see also Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005) (recognizing that where RFC falls between sedentary and light work, Grids are used only as framework); *Hence v. Astrue*, No. 4:12cv1, 2012 WL 6691573, at *8 (E.D. Va. Nov. 30, 2012) (citing the Grids and SSR 83-12 in observing that where a claimant's

RFC is between exertional levels, the Grids do not apply), report and recommendation adopted by 2012 WL 6697109 (E.D. Va. Dec. 21, 2012); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 821 (N.D. Ill. 2006) (stating that Grids only provide guidance where claimant falls between exertional levels).

Because the analysis subtly shifts at step five from an assessment of the claimant's limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *2; *see also* SSR 96-8p, 1996 WL 374184, at *2 (recognizing RFC represents most that individual can do given limitations). From there, the ALJ must determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level. SSR 83-10, 1983 WL 31251, at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184, at *3. If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. *See* SSR 83-14, 1983 WL 31254, at *6 ("Where it is clear that additional limitations or restrictions

have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."). In making this determination, "the ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan*, 142 F. App'x at 720-21.

In this case, the ALJ found that Claimant had the RFC to perform light work, but with a limitation that he could only stand and/or walk for two hours out of an

eight hour workday. (Tr. at 20). In this regard, the ALJ disagreed with Dr. Reddy's Physical RFC Assessment wherein she opined that Claimant could stand and/or walk for six hours out of an eight-hour workday. (Tr. at 23, 353). The ALJ assigned "some weight" to Dr. Reddy's opinion, but found that Claimant's complaints of pain rendered him "more functionally limited" than Dr. Reddy concluded, and therefore, the ALJ accounted for those greater limitations in determining Claimant's RFC. (Tr. at 23).

At the administrative hearing, the ALJ asked the vocational expert whether there were jobs in the light work category that someone with Claimant's age, education, work history, and limitations, excluding the standing and/or walking limitation, could perform. (Tr. at 47). The vocational expert replied that such jobs existed and that those jobs included battery tester, air purifier servicer, and light assembly worker. (Tr. at 48). The ALJ then added the two-hour standing and walking limitation to the hypothetical and inquired of the vocational expert whether jobs existed in the light work category that a person with that limitation could perform. (*Id.*) The vocational expert responded that the battery tester and assembly worker jobs would allow "for that particular postural change in abilities," but that the air purifier servicer would not because it required more standing and walking than two hours per eight-hour workday. (*Id.*) As such, the vocational expert substituted another job at the light work level that could be performed primarily from a seated position, which was the job of garment bagger. (*Id.*) The vocational expert added that the battery tester and light assembly worker jobs could also be performed primarily from a seated position. (*Id.*) Finally, the vocational expert testified that there were 45,000 jobs nationally and 1050 jobs regionally for a battery tester; 195,000 jobs

nationally and 7500 jobs regionally for a light assembly worker; and 165,000 jobs nationally and 7250 jobs regionally for a garment bagger. (Tr. at 48-49). Given this testimony and Claimant's RFC, the ALJ found at step five that Claimant could perform jobs that existed in significant numbers in the national economy, including work in light unskilled occupations, such as battery tester, light assembly worker, and garment bagger. (Tr. at 24-25).

As stated above, Claimant asserts that the standing and/or walking limitation permits Claimant only to perform sedentary work. Under the regulations, "sedentary work" is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). Furthermore, "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* §§ 404.1567(a), 416.967(a); *see also* SSR 83-10, 1983 WL 31251, at *5 (defining sedentary work). In contrast, "light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b); *see also* SSR 83-10, 1983 WL 31251 at *5-*6 (defining light work). "[T]he ***full range*** of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251 at

*6 (emphasis added). The SSA explains that:

> The major difference between sedentary and light work is that most light jobs--particularly those at the unskilled level of complexity--require a person to be standing or walking most of the workday. Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist.

SSR 83-14, 1983 WL 31254, at *4; *see also* SSR 83-10, 1983 WL 31251, at *5 (explaining that the "good deal of walking or standing" in light jobs is "the primary difference between sedentary and most light jobs."). While there are "[r]elatively few unskilled light jobs ... performed in a seated position," there are unskilled light jobs accommodating a standing or walking limitation nonetheless. SSR 83-10, 1983 WL 31251, at *5.

To begin, Claimant overlooks the possibility that an RFC may fall between exertional categories. *See, e.g.*, *Golini v. Astrue*, 483 F. App'x 806, 808 (4th Cir. 2012) (recognizing that claimant's RFC may exist between exertional categories). An ALJ need not rigidly apply exertional categories to a claimant's impairments; instead, where additional limitations exist such that a claimant does not fall neatly within an exertional category, an ALJ should take those limitations into account when determining a claimant's RFC and appropriately reduce the occupational base to fit the claimant's individual characteristics at step five of the process. *See* 20 C.F.R. §§ 404.1569, 416.969; SSR 83-12, 1983 WL 31253, at *2 (noting that an adjudicator is to consider extent of erosion of occupational base and "access its significance"). If the ALJ is unclear as to the remaining occupational base given any additional limitations, then the ALJ must consult a vocational resource. SSR 83-12, 1983 WL 31253, at *2;

*see also* SSR 83-14, 1983 WL 31254, at *6 (stating where ALJ does not have clear understanding of effects of additional limitations on job base, services of a vocational expert are necessary); *Knapton v. Soc. Sec. Admin. Comm'r*, No. 1:13-CV-00168, 2014 WL 1608389, at *5 (D.Me. Apr. 22, 2014) (same). In this case, that is precisely what the ALJ did. The ALJ recognized that Claimant's limitations permitted him to perform light work with an additional limitation related to standing and walking, which essentially placed Claimant between exertional categories with the *most* that he could do consisting of light level work. (Tr. at 20). As such, the ALJ questioned a vocational expert as to how the additional limitation would affect the occupational base that the vocational expert had previously identified was available *without* the limitation. (Tr. at 47-48). The vocational expert's testimony clarified that light level work still existed with the additional standing and walking limitation. (Tr. at 48-49).

To the extent that Claimant argues that his RFC as determined by the ALJ requires a finding that he can only perform sedentary work, his argument is unpersuasive because he fails to understand the difference between the full range of light work and a reduced range of light work. "[A]n RFC limiting standing or walking to about two hours does not mandate a finding that [a claimant] could only perform sedentary work." *Hence*, 2012 WL 6691573, at *8; *see also Norris v. Comm'r Soc. Sec.*, No. WDQ-13-2426, 2014 WL 2612367, at *4 (D.Md. June 9, 2014) (report and recommendation rejecting argument that RFC limiting claimant's ability to stand and walk to between two and six hours was inconsistent with finding claimant could perform light work); *Knowles v. Colvin*, No. 1:12-cv-371, 2014 WL 1153063, at *7 (S.D.Miss. Mar. 21, 2014) (finding that two-hour standing and walking limitation could be consistent with definition of light work); *Willoughby v. Comm'r, Soc. Sec.*,

No. RDB-13-0489, 2013 WL 5496834, at *1 (D.Md. Oct. 2, 2013) (report and recommendation recognizing that two-hour standing and walking limitation did not preclude finding that claimant could perform reduced range of light work); *Lackey v. Colvin*, No. 12-516, 2013 WL 1903662, at *2 (W.D.Pa. May 7, 2013) (rejecting claimant's argument that four-hour standing and walking limitation was inconsistent with ability to perform light work); *Moaney v. Astrue*, No. PWG-09-1838, 2010 WL 3719297, at *3 (D.Md. Sept. 17, 2010) (finding that ability to occasionally lift twenty pounds, frequently lift ten pounds, and stand or walk for two hours was consistent with finding that claimant could perform light work). Significantly, Claimant has not cited any decision in support of his position to the contrary. While Claimant cites SSR 83-10 and the definition of light work contained in the DOT, neither supports his contention. As discussed above, SSR 83-10 sets out the definition for the *full range* of light work. 1983 WL 31251, at *5-*6. The ALJ did not find that Claimant could perform the full range of light work; rather, the ALJ found that Claimant could perform a reduced range of light work given his standing and walking limitation. (Tr. at 25). The definition of light work includes jobs that can be performed while "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls," SSR 83-10, 1983 WL 31251, at *5, and Claimant does not argue nor do the medical records establish that he cannot perform the requirements of those positions. Furthermore, SSR 83-10 recognizes that there are unskilled light level jobs that may be performed from a seated position. *Id.* As such, the ALJ's finding as to the exertional level consistent with Claimant's RFC did not run afoul of SSR 83-10.

Moreover, contrary to Claimant's assertion, the ALJ's hypothetical questions to the vocational expert did not violate SSR 83-10 because, as explained above, light

34

work includes jobs that permit a two-hour standing and walking limitation. (ECF No.

16 at 2). Furthermore, the definitions of light work contained in the DOT do not

conflict with the vocational expert's testimony that the positions suitable for Claimant

could primarily be performed from a seated position. The DOT entries for battery

tester, light assembly worker, and garment bagger, all state:

> STRENGTH: Light Work - Exerting up to 20 pounds of force
> occasionally (Occasionally: activity or condition exists up to 1/3 of the
> time) and/or up to 10 pounds of force frequently (Frequently: activity or
> condition exists from 1/3 to 2/3 of the time) and/or a negligible amount
> of force constantly (Constantly: activity or condition exists 2/3 or more
> of the time) to move objects. Physical demand requirements are in
> excess of those for Sedentary Work. Even though the weight lifted may
> be only a negligible amount, a job should be rated Light Work: (1) when
> it requires walking or standing to a significant degree; or (2) when it
> requires sitting most of the time but entails pushing and/or pulling of
> arm or leg controls; and/or (3) when the job requires working at a
> production rate pace entailing the constant pushing and/or pulling of
> materials even though the weight of those materials is negligible.

DOT 727.384-010, 1991 WL 679649 (battery tester); DOT 706.684-022, 1991 WL

679050 (small products assembler); DOT 920.687-018, 1991 WL 687965 (garment

bagger). As with SSR 83-10, the definition of light work in the DOT includes jobs that

*do not* require walking or standing to a significant degree, including positions that

can be performed while sitting most of the time. The vocational expert's testimony

further clarified, rather than contradicted, the requirements of the three jobs, and he

unequivocally confirmed that the three jobs he listed could be performed primarily

from a seated position taking Claimant's standing and walking limitation into

account. (Tr. at 48). Because the vocational expert's testimony was consistent with

the SSA's regulatory policies and definitions, as well as with the Dictionary of

Occupational Titles, and the vocational expert did not testify that any job entailed

light work when the regulations or rulings stated otherwise, the ALJ did not violate

SSR 00-4p by relying on his testimony.[5]

Finally, the ALJ complied with SSR 83-14 not only by requesting the services of a vocational expert in this case, but also by making clear in his written decision the examples of jobs that Claimant could perform and the number of those jobs available in the economy. 1983 WL 31254, at *6; *see also* (Tr. at 25). Here, the vocational expert testified that there were 45,000 jobs nationally and 1050 jobs regionally for a battery tester; 195,000 jobs nationally and 7500 jobs regionally for a light assembly worker; and 165,000 jobs nationally and 7250 jobs regionally for a garment bagger. (Tr. at 48-49). The ALJ incorporated these figures into his written decision. (Tr. at 25). The Fourth Circuit has recognized that 110 jobs in a given region may constitute a significant number of jobs as required by the regulations. *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979); *see also Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013) (recognizing *Hicks* found 110 jobs in claimant's state to be significant number of jobs); *Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *5 (4th Cir. Jan. 11, 1999) (unpublished table decision) (holding claimant's concession that hundreds of jobs were available defeated claim related to significant number of jobs); *Hyatt v. Apfel*, 153 F.3d 720, 1998 WL 480722, at *3 (4th Cir. Aug. 6, 1998) (unpublished table decision) (holding 650 jobs in claimant's state was significant number of jobs). Given the vocational expert's testimony related to the number of jobs suitable for Claimant in the national and regional economies, the ALJ's conclusion that "the claimant is capable of making a successful adjustment to other work that exists in

---

[5] At the outset of the ALJ's questioning of the vocational expert, the ALJ asked the vocational expert if he was familiar with the DOT. (Tr. at 46). The vocational expert answered affirmatively. (*Id.*) The ALJ then asked the vocational expert to inform him if the vocational expert's testimony conflicted with the DOT. (*Id.*) The vocational expert stated that he would do so. (*Id.*) In his written decision, the ALJ found the vocational expert's testimony to be consistent with the DOT. (Tr. at 25).

significant numbers in the national economy," is supported by substantial evidence. (Tr. at 25).

In sum, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **FIND** that substantial evidence supports the ALJ's decision at step five of the sequential process. The ALJ correctly followed the procedure required where a claimant's RFC falls between two exertional levels. Moreover, the ALJ appropriately relied on the testimony of the vocational expert in this case. Accordingly, the undersigned respectfully **RECOMMENDS** that the Commissioner's decision be **AFFIRMED**.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 14), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 15), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections,

identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 20, 2015

Cheryl A. Eifert
United States Magistrate Judge